## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **BRISTOW ENDEAVOR HEALTHCARE, LLC,** | ) ) ) | |
| **Plaintiff,** | ) ) | |
| **v.** | ) ) | **Case No. 16-CV-0057-CVE-PJC** |
| **BLUE CROSS AND BLUE SHIELD ASSOCIATION et al.,** | ) ) ) | |
| **Defendants.** | ) ) ) | |

## <u>OPINION AND ORDER</u>

Now before the Court are Defendant Health Care Service Corporations's Motion to Dismiss Plaintiff's Complaint (Dkt. # 68) and Defendant Blue Cross and Blue Shield Association's Motion to Dismiss Plaintiff's Complaint (Dkt # 72). Defendants Health Care Service Corporation (HCSC) and Blue Cross and Blue Shield Association (BCBSA) argue that plaintiff has failed to state a claim upon which relief can be granted.[1] Plaintiff responds that HCSC and BCBSA have overstated the pleading requirements to allege antitrust claims, and that it has adequately stated antitrust and state law tort claims against defendants.

## I.

Bristow Endeavor Healthcare, LLC (Bristow Healthcare) owns and operates Bristow Medical Center (BMC), Cimarron Healthcare Center (Cimarron), and the Center for Orthopaedic Reconstruction & Excellence (CORE). BMC and Cimarron opened in 2011 or earlier, but CORE

---

[1]     BCBSA and HCSC have also filed a motion to stay discovery pending a ruling on their motions to dismiss. Dkt. # 90. The motion to stay discovery (Dkt. # 90) is moot in light of this Opinion and Order ruling on the motions to dismiss.

did not open until July 2015.  CORE is located in Jenks, Oklahoma and it has operating rooms, procedure rooms, inpatient beds, and a 24 hour emergency center.  Plaintiff alleges that BCBSA is a federation of "independent, community-based, and locally operated Blue Cross Blue Shield companies," and one of those independent Blue Cross Blue Shield companies is HCSC.  Dkt. # 2, at 5.  HCSC operates in Oklahoma, Illinois, New Mexico, and Texas, and plaintiff alleges that HCSC operates under the trade name Blue Cross and Blue Shield of Oklahoma when conducting business in Oklahoma.[2]  Plaintiff alleges that HCSC has a market share of at least 64 percent for health insurers in Northeast Oklahoma/Tulsa.  Hillcrest Health System (HHS) is a non-profit corporation that operates at least nine hospitals or medical centers, and plaintiff alleges that HHS is owned and operated by Ardent Medical Services, Inc. (Ardent).  Plaintiff claims that Ardent purchased HHS in 2004 when HHS was struggling financially and that Ardent invested over $362 million into HHS, and HHS opened a new Spine and Orthopedic Center.  According to plaintiff, Bristow Healthcare is HHS' largest competitor and HHS "exercises market dominance within the relevant product (inpatient and outpatient healthcare services and all reasonably interchangeable substitute services) and geographic markets (Northeast Oklahoma/Tulsa area)."  Id. at 7.

---

[2]     Plaintiff refers to HCSC and BCBSA collectively as "Blue Cross Blue Shield," but the complaint clearly alleges that they are separate entities and there are no allegations concerning piercing the corporate veil or disregarding the corporate entity of BCBSA under any theory.  HCSC and BCBSA raise separate arguments in their motions to dismiss and they are proceeding as separate and independent parties, and the Court will refer to HCSC and BCBSA as separate entities in this Opinion and Order.  The complaint is clear that HCSC is the Blue Cross Blue Shield entity operating in Oklahoma and there are no allegations of direct dealings between BCBSA and Bristow Healthcare, and the Court will refer to HCSC as the party interacting with Bristow Healthcare during the contractual negotiations.

Bristow Healthcare is an in-network provider for HCSC and it requested to add Cimarron as an in-network provider in July 2013, and it was seeking to add Cimarron under Bristow Healthcare's existing provider agreement with HCSC. HCSC classified Cimarron as an ambulatory surgical center for the purpose of contractual negotiations. On January 14, 2014, HCSC offered to add Cimarron to Bristow Healthcare's provider agreement using a blended rate that would apply to BMC and Cimarron. Plaintiff alleges that the rates offered by HCSC represented a drastic reduction in the rates being paid to BMC under the existing provider agreement, and Bristow Healthcare submitted a counteroffer to HCSC. HCSC would not agree to pay separate rates for BMC and Cimarron, but it did submit a counteroffer to Bristow Healthcare with higher reimbursement rates. The parties reached an agreement that would add Cimarron to Bristow Healthcare's provider agreement using blended rates, but Bristow Healthcare claims that the blended rates were 9 percent below the rates previously paid to BMC. On March 28, 2013, Bristow Healthcare executed the new provider agreement adding Cimarron as a provider.

Bristow Healthcare claims that it had an "implicit understanding that the negotiations for the Bristow Agreement would include all existing and future entities of Bristow Healthcare." Id. at 11. To add a new entity to the provider agreement, Bristow Healthcare is required to "submit an Additional Entities Information Document for each entity, and shall obtain The Plan's consent to the addition of these entities to this Agreement." Dkt. # 2-3, at 20. The provider agreement also provides the following clause:

> 10.9   Entire Agreement: This Agreement, together with all attachments and Exhibits, contains the entire Agreement between The Plan and Hospital relating to the rights granted and the obligations assumed by the parties concerning the provision of services to Member. Any prior agreements, promises, negotiations, or representations, either oral or written, relating to

3

the subject matter of this Agreement not expressly set forth in this Agreement
are of no force or effect.

Id. at 43.  The provider agreement is a managed care contract under which HCSC agrees to
reimburse Bristow Healthcare for in-network, covered services provided at BMC or Cimarron.
Bristow Healthcare believes that HHS also has a managed care contract with HCSC, but it believes
that HHS has significantly higher reimbursement rates from HCSC.

On March 3, 2015, Bristow Healthcare opened the CORE facility in Jenks and it notified
HSCS that it wanted to have CORE added to Bristow Healthcare's existing provider agreement.
HSCS sent a credentialing application to Bristow Healthcare on March 16, 2015 and it informed
Bristow Healthcare that the application would need to be completed before HCSC could determine
whether it would consider adding CORE as in-network provider to the existing provider agreement
with Bristow Healthcare or possibly a separate agreement with CORE only.  HCSC advised Bristow
Healthcare that it could take up to 45 days to complete the credentialing process, but plaintiff alleges
that HCSC has still not made a decision on CORE's credentialing application.  HCSC requested a
list of all persons or entities that possess an ownership interest in CORE and, on June 11, 2015,
HCSC advised Bristow Healthcare that the information was being reviewed.  On June 30, 2015,
HCSC notified Bristow Healthcare that it would not agree to add CORE as a provider under the
existing provider agreement, but it would consider contracting separately with CORE if it obtained
a separate National Provider Identifier.  Dkt. # 2-6.  Bristow Healthcare sent a letter in response to
HCSC's denial of its request to add CORE to the existing provider agreement, and Bristow
Healthcare asked to meet with HCSC to avoid the alternative dispute resolution process required in
the provider agreement.  Dkt. # 2-7.  HCSC requested a copy of CORE's license from the State of
Oklahoma and the license identified CORE as a "division of Bristow Medical Center."  HCSC also

4

requested additional information about the number and type of procedures performed at CORE and the financial classification of CORE's patients. Bristow Healthcare submitted all of the requested information to HCSC, and representatives of HCSC and Bristow Healthcare had a phone conference on September 18, 2015 during which HCSC acknowledged that it had received the information.

On October 29, 2015, BMC sent a letter to HCSC stating that its surgical department would be closed temporarily for renovation, and BMC requested permission to refer patients to CORE for in-network care. Dkt. # 2-9, at 1. HCSC responded that physicians at BMC should refer patients to in-network providers as required by the participating physician agreements executed by the physicians. Id. On December 4, 2015, Rick Kelly, senior vice president of "Blue Cross Association"[3] met with a representative of Bristow Healthcare to discuss CORE's application and the reasons for HCSC's refusal to add CORE as an in-network provider. Kelly allegedly stated that he would provide a formal response after the meeting, but no response has been provided by Kelly. Bristow Healthcare believes that HHS and Ardent have "plotted to exclude CORE from the Northeast Oklahoma/Tulsa area healthcare marketplace. Plaintiff alleges that, dating back to 2011, Thom Biby, a representative of the Tulsa Spine & Specialty Hospital (Tulsa Spine) owned by HHS, has had weekly meetings with HHS and Ardent "to discuss affairs, including CORE," and they allegedly "agreed that [HCSC] would reimburse [HHS] for in-network services at rates well above the current Medicare rates." Dkt. # 2, at 18-19. A representative of Ardent, Eddie Gwock, allegedly told representatives of Tulsa Spine that he could "leverage" his relationship with HCSC to prevent HCSC from contracting with CORE. Id. at 19. Plaintiff alleges that Tulsa Spine hired a private

---

[3]      In its response to defendants' motion to dismiss, plaintiff refers to Kelly as senior vice president of BCBSA. See Dkt. # 76, at 7.

5

investigator to "investigate who the participants, players and physicians were that would be involved in the start-up of CORE." Id.  Plaintiff claims that HCSC talked to HHS about ways to prevent CORE from becoming an in-network provider with HCSC in order to keep HHS from losing its market share.

Plaintiff filed this case against BCBSA, HCSC, and six other defendants alleging antitrust claims under federal and state law.[4]  Plaintiff alleges a claim under § 1 of the Sherman Act, 15 U.S.C. § 1 (count one).  It asserts that defendants engaged in an anticompetitive conspiracy to keep CORE out of the market in Northeast Oklahoma/Tulsa for inpatient and outpatient healthcare services, and it argues that the alleged conspiracy is illegal per se and illegal under the rule of reason. Dkt. # 2, at 23.  The alleged antitrust injury suffered by plaintiff is "having been paid lower rates, having fewer surgeries performed at their facilities, otherwise having business diverted to competitors who were part of the illicit conspiracy, combination and/or contract, and/or having access to far fewer patients than they would have with fair competition but for [HCSC] and its co-conspirators' anticompetitive agreements and practices." Id. at 24.  Plaintiff alleges that the same conduct violated the Oklahoma Antitrust Reform Act, OKLA. STAT. tit. 79, § 201 et seq. (count two), and it alleges another claim under the Oklahoma Antitrust Reform Act (count three) on the theory that defendants' conduct constituted an effort to monopolize the market for "inpatient and outpatient

_____

[4]     Plaintiff has voluntarily dismissed without prejudice its claims against Hillcrest Healthcare System, Inc.  Dkt. # 74.

healthcare services in the Northeast Oklahoma/Tulsa area."[5]  Id. at 26.  Finally, plaintiff alleges that defendants' conduct constituted tortious interference with business relations in violation of Oklahoma law (count four).

## II.

In considering a motion to dismiss under Rule 12(b)(6), a court must determine whether the claimant has stated a claim upon which relief may be granted.  A motion to dismiss is properly granted when a complaint provides no "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action."  Bell Atlantic Corp. v. Twombly, 550 U.S. 544,  555 (2007). A complaint must contain enough "facts to state a claim to relief that is plausible on its face" and the factual allegations "must be enough to raise a right to relief above the speculative level."  Id. (citations omitted).  "Once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint."  Id. at 562.  Although decided within an antitrust context, Twombly "expounded the pleading standard for all civil actions."  Ashcroft v. Iqbal, 556 U.S. 662, 684 (2009).  For the purpose of making the dismissal determination, a court must accept all the well-pleaded allegations of the complaint as true, even if doubtful in fact, and must construe the allegations in the light most favorable to claimant.  Twombly, 550 U.S. at 555; Alvarado v. KOB-TV, LLC, 493 F.3d 1210, 1215 (10th Cir. 2007); Moffett v. Halliburton Energy Servs., Inc., 291 F.3d 1227, 1231 (10th Cir. 2002).  However, a court need not accept as true those allegations that are conclusory in nature.  Erikson v. Pawnee County Bd. Of County Comm'rs, 263

---

[5]     The Oklahoma Antitrust Reform Act expressly states that the "provisions of this act shall be interpreted in a manner consistent with Federal Antitrust Law, 15 U.S.C. § 1 et seq. and the case law applicable thereto."  OKLA. STAT. tit. 79, § 212.  Therefore, it is unnecessary to engage in a separate analysis for plaintiff's state and federal antitrust claims.  See Cohlmia v. Ardent Health Services, LLC, 448 F. Supp. 2d 1253, 1262 (N.D. Okla. 2006).

F.3d 1151, 1154-55 (10th Cir. 2001).   "[C]onclusory allegations without supporting factual averments are insufficient to state a claim upon which relief can be based."   Hall v. Bellmon, 935 F.2d 1106, 1109-10 (10th Cir. 1991).

## III.

BCBSA argues that it is not a proper party because there are no allegations that BCBSA had any role in the alleged conspiracy and, even if such allegations had been made, the complaint fails to state sufficient facts to support antitrust claims against BCBSA.  Dkt. # 73, at 13-17.  BCBSA argues that the complaint fails to contain any allegations concerning BCBSA's participation in the alleged conspiracy, and it claims that plaintiff's references to a non-existent entity "Blue Cross Blue Shield" do not give BCBSA sufficient notice of the basis for plaintiff's claims against it.  Plaintiff argues that BCBSA can be held liable under an alter ego theory of liability and it has adequately alleged that BCBSA had a role in the alleged anticompetitive conspiracy.[6]  Dkt. # 76, at 7-8.

The Court will initially consider BCBSA's argument that the complaint fails to identify its role in the alleged conspiracy, and the Court's focus is only on the allegations contained in plaintiff's complaint.  Plaintiff alleges that BCBSA is an Illinois corporation and that BCBSA is a "national federation of 36 independent, community-based, and locally operated Blue Cross Blue Shield companies."  Dkt. # 2, at 5 (citing a website).  Plaintiff further states that "[o]ne of those independent Blue Cross Blue Shield companies is [HCSC] -- owner of the tradename Blue Cross and Blue Shield of Oklahoma."  Id.  In the complaint, plaintiff refers to BCBSA and HCSC collectively as "Blue Cross Blue Shield," but there is no allegation that corporate separateness of

---

[6]     Plaintiff has filed notice (Dkt. # 77) that it is withdrawing its argument that BCBSA's motion to dismiss was untimely.

the two entities should be disregarded.  Plaintiff alleges that senior vice president of BCBSA, Kelly, met with a representative of Bristow Healthcare concerning CORE's application, but there are no allegations that Kelly had any role in the alleged conspiracy with HHS and Ardent to keep CORE from gaining in-network status.  Id. at 17.  There are no other allegations of the complaint that specifically mention BCBSA.

Plaintiff argues that BCBSA can be held liable under an alter ego theory, but this argument is unsuccessful for two reasons.  First, plaintiff makes no allegations in the complaint that would support an inference that HCSC is the alter ego of BCBSA.  The complaint clearly alleges that HCSC is an "independent" corporate entity operating under the tradename Blue Cross and Blue Shield of Oklahoma, and that the companies associated with BCBSA were "independent" and "locally-operated."  Dkt. # 2, at 5.  Plaintiff claims that the complaint "specifically alleges that BCBSA, at the very least through Senior Vice President Rick Kelly and potentially through others, played a key role in the alleged conspiracy."  Dkt. # 76, at 7.  The complaint contains an allegation that Kelly met with a representative of CORE, but there are no allegations that Kelly knew about the alleged conspiracy involving HHS, Ardent, and HCSC or that Kelly was acting in furtherance of the conspiracy, and the mere fact that he met with a representative of CORE would not suggest that Kelly was engaging in an anticompetive conspiracy.  Plaintiff does not make any allegations in the complaint that would have given BCBSA notice that plaintiff intended to proceed against BCBSA under an alter ego theory.  Second, even if the Court were to consider statements in plaintiff's response, there still would not be enough factual allegations to give BCBSA notice of the basis for plaintiff's assertion that HCSC is the alter ego of BCBSA.  The only fact alleged by plaintiff specifically concerning BCBSA's involvement in the alleged conspiracy is Kelly's meeting

with CORE, and this by itself is insufficient to support an inference that BCBSA had any role in the alleged conspiracy or that BCBSA intended to disregard the corporate separateness of HCSC.  As the Supreme Court noted in <u>Twombly</u>, "it is one thing to be cautious before dismissing an antitrust complaint in advance of discovery . . . but quite another to forget that proceeding to antitrust discovery can be expensive." <u>Twombly</u>, 550 U.S. at 558.  Even considering statements in plaintiff's response, it is clear that plaintiff does not have a factual basis to allege that BCBSA was the alter ego of HCSC, and the Court finds no basis to subject BCBSA to expensive and prolonged antitrust discovery.  BCBSA's motion to dismiss should be granted, because plaintiff has not alleged that BCBSA played any role in the alleged anticompetitive conspiracy.

## IV.

HCSC argues that plaintiff's antitrust claims should be dismissed because plaintiff has not adequately alleged that HCSC's conduct caused an antitrust injury or that HCSC participated in an antitrust conspiracy.  HCSC also asserts that plaintiff's monopolization claim is facially implausible, because plaintiff is essentially alleging that a buyer of healthcare services conspired with healthcare providers to pay higher rates to a competitor of the plaintiff.  Plaintiff responds that it has adequately alleged an antitrust injury based on harm to patients' choice of a healthcare provider and patients will be required to pay more for health services if CORE is not made an in-network provider.  Plaintiff also argues that HCSC exercises market dominance over the health insurance market in Northeast Oklahoma/Tulsa and that plaintiff has adequately alleged that HCSC entered a conspiracy to exclude plaintiff from the relevant marketplace.

10

**A.**

HCSC argues that the alleged conspiracy to deny in-network status to CORE is implausible and insufficiently alleged under <u>Twombly</u>.  HCSC argues that the complaint fails to provide notice of the details of the alleged conspiracy and fails to state a plausible case that HCSC would enter a conspiracy under which it would lose money by paying higher rates to HHS and Ardent.  Plaintiff responds that it has adequately alleged the existence of a conspiracy to exclude CORE from HCSC's provider network and it is not required to specifically allege the identity of the persons at HCSC involved in planning the conspiracy or the details of the conspiracy.

Plaintiff has asserted a claim under § 1 of the Sherman Act, and this statute provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce among the several States . . . is declared to be illegal." 15 U.S.C. § 1.  The Supreme Court specifically considered the pleading requirement for a § 1 Sherman Act claim in <u>Twombly</u> and held that "stating such a claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made." <u>Twombly</u>, 550 U.S. at 556.  The complaint must state facts raising a "reasonable expectation that discovery will reveal evidence of a illegal agreement . . . even if it strikes a saavy judge that actual proof of those facts is improbable . . . ." <u>Id.</u>  Federal courts should consider prior rulings in antitrust cases to assist with the determination of whether an alleged conspiracy is plausible for the purpose of federal antitrust law. <u>Id.</u> at 556-57.

The Court has reviewed the factual allegations of the complaint in seeking to determine if plaintiff has alleged a plausible § 1 claim under the Sherman Act.  In early 2014, HCSC negotiated a new provider agreement with Bristow Healthcare that would include Cimarron as an in-network provider, but the reimbursement rates offered by HCSC were lower than rates being paid under the

11

then-existing provider agreement with Bristow Healthcare.  Dkt. # 2, at 9-10. The parties reached

an agreement that would include Cimarron and BMC in a new provider agreement, but Bristow

Healthcare believes that HHS has a provider agreement with substantially higher reimbursement

rates. Id. at 11.  In March 2015, Bristow Healthcare notified HCSC that it intended to open CORE

and that it would seek to have CORE added to the existing provider agreement with BMC and

Cimarron, and HCSC sent a credentialing application to Bristow Healthcare.  Id. at 12.  Bristow

Healthcare completed the credentialing application and HCSC requested additional information from

Bristow Healthcare, and HCSC advised Bristow Healthcare that it was reviewing the credentialing

application.  On June 30, 2015, HCSC advised Bristow Healthcare that it would not add CORE to

the existing provider agreement with Bristow Healthcare but it would consider entering into a

separate agreement with CORE.  Dkt. # 2-6.  Bristow Healthcare alleges that the denial of its request

to add CORE to the existing provider agreement was part a conspiracy with HHS and Ardent to

exclude CORE from the healthcare marketplace.  Dkt. # 2, at 18.  In particular, Bristow Healthcare

claims that HHS owned and operated Tulsa Spine, and representatives of Tulsa Spine met with HHS

and Ardent to "discuss affairs, including CORE."  Id.  According to the complaint, Tulsa Spine,

HHS, and Ardent agreed among themselves that HCSC would reimburse them at rates well above

the rates paid by Medicare and that HCSC agreed to pay the higher rates requested by Tulsa Spine,

HHS, and Ardent.  Id. at 19.  Bristow Healthcare alleges that representatives of HHS and Ardent

spoke to HCSC about keeping CORE out of HCSC's network and that CORE is still currently

excluded from the network.  Id.  The alleged purpose of the conspiracy to keep CORE out of the

network was to maintain and eventually increase HHS's share of the healthcare marketplace in

Tulsa/Northeast Oklahoma. Id. at 20.  Bristow Healthcare further alleges that, as part of the alleged

conspiracy, HCSC has threatened to terminate agreements with physicians who refer patients to CORE. Id.

To state a claim under § 1 of the Sherman Act, plaintiff must allege sufficient facts for the Court to infer that the defendants "entered a contract, combination, or conspiracy that unreasonably restrains trade in the relevant market." TV Commc'n Network, Inc. v. Turner Network Television, Inc., 964 F. 2d 1022 (10th Cir. 1992). A contract, combination, or conspiracy is illegal under § 1 if "(1) it 'constitute[s] a per se violation of the statute'; or (2) its 'purpose or effect is to create an unreasonable restraint of trade.'" Id. (quoting Cayman Exploration Corp. v. United Gas Pipe Line Co., 873 F.2d 1357 (10th Cir. 1989)). Per se liability applies only when "the surrounding circumstances make the likelihood of anticompetitive conduct so great as to render unjustified further examination of the challenged conduct." Nat'l Collegiate Athletic Ass'n v. Board of Regents of University of Oklahoma, 468 U.S. 85, 108 (1984). The concern for anticompetive effects from an agreement is greatest when competitors or would-be competitors cooperate to fix prices, engage in a group boycott, or enter an exclusive dealing arrangement, and per se liability does not apply to a vertical arrangement involving entities at different levels of the market. Campfield v. State Farm Mut. Auto. Ins. Co., 532 F.3d 1111, 1120 (10th Cir. 2008). In most cases, courts will apply the rule of reason to determine whether the alleged conduct violates § 1 of the Sherman Act, and courts must consider all of the circumstances to decide whether the alleged restrictive practice imposes an unreasonable restraint on competition. Diaz v. Farley, 215 F.3d 1175, 1182 (10th Cir. 2000).

The alleged conspiracy in this case involves a vertical arrangement between HCSC as the buyer of health care services and HHS and Ardent as the provider of health care services to exclude a competitor of HHS and Ardent from the marketplace. Plaintiff has identified no theory under

which per se liability would apply and the Court finds that plaintiff's § 1 claim is governed by the rule of reason. Construing the allegations of the complaint in favor of plaintiff, the Court finds that plaintiff has not alleged enough facts to state a plausible § 1 claim against HCSC, even if plaintiff has alleged that HHS and Ardent attempted to conspire to keep CORE out of HCSC's provider network. The complaint contains numerous allegations concerning HHS, Ardent, and Tulsa Spine's alleged conduct and their motivation for keeping CORE out of HCSC's provider network, but there are no allegations that HCSC participated in any meeting or communications with them before HCSC denied Bristow Healthcare's request to add CORE to the existing provider agreement. Plaintiff alleges that HCSC "effectively" conspired with HHS and Ardent to maintain their market share, but the complaint fails to actually connect the alleged agreement between HHS and Ardent and HCSC's decision not to add CORE to Bristow Healthcare's existing provider agreement. The alleged conspiracy would clearly be beneficial to HHS and Ardent, but plaintiff makes no allegations that would make the conspiracy plausible from the perspective of HCSC. In particular, there are no allegations that HCSC received any benefit from the conspiracy and, quite to the contrary, plaintiff suggests that HCSC conspired with HHS and Ardent to reduce competition and actually pay higher reimbursement rates to HHS and Ardent. Plaintiff argues that HCSC's stated reason for refusing to add CORE to Bristow Healthcare's existing provider agreement is patently false and this is sufficient to give rise to an inference that HCSC kept CORE out of the provider network as part of a conspiracy. Dkt. # 75, at 16-17. Plaintiff claims that HCSC added Cimarron to Bristow's existing agreement and it made no business sense for HCSC to require CORE to enter separate and independent provider agreement to join HCSC's network. According to the complaint, HCSC did not simply add Cimarron to the existing provider agreement, and HCSC required Bristow Healthcare

14

to renegotiate the agreement and sign a new contract before Cimarron would be added to the network.[7]  Dkt. # 2, at 11-12.  The allegations of the complaint do not adequately allege that HCSC participated in a conspiracy to exclude CORE from its provider network.

HCSC also argues that plaintiff has not adequately alleged that it has suffered an antitrust injury as a result of any alleged conspiracy involving HCSC, HHS, and Ardent, because there are no allegations that the alleged conspiracy caused injury to customers or the healthcare market.  Dkt. # 69, at 18-22.  Plaintiff responds that it has adequately alleged that health care consumers will have reduced choice and higher prices because of the alleged conspiracy, and this satisfies the requirement that plaintiff allege an antitrust injury.  Dkt. # 75, at 22-24.

A plaintiff seeking relief under antitrust law must allege that it suffered an "antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful."  Atlantic Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 334 (1990).  "The [Sherman Act] directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition."  JetAway Aviation, LLC v. Board of County Commr's of County of Montrose, Colorado, 754 F.3d 824, 833 (10th Cir. 2014).  "'The primary concern of the antitrust laws is the corruption of the competitive process, not the success or failure of a particular firm' or individual."  Cohlmia v. St. John Med. Center, 693 F.3d 1269, 1281 (10th Cir. 2012).  The Sherman Act does not concern the "vindication of general 'notions of fair dealing,' which are the subject of many other laws at both the federal and state level," but the Sherman Act was meant to protect competition and prevent monopolization.  Four

---

[7]     It is also apparent that Bristow Healthcare was dissatisfied with the blended rate in the new agreement and that it would have preferred if HCSC had simply extended the terms of the existing agreement to Cimarron.  See Dkt. # 2, at 12.

Corners Neprology Associates, P.C. v. Mercy Med. Center of Durango, 582 F.3d 1216 (10th Cir. 2009).

The Court has reviewed the allegations of the complaint, and the theory of antitrust injury advanced by plaintiff in its response to HCSC's motion to dismiss is not alleged in the complaint. The complaint does allege that HCSC pays higher reimbursement rates to HHS than it does to Bristow Healthcare, but there is no allegation that patients at HHS pay more for medical treatment at HHS.  Dkt. # 2, at 19.  Plaintiff could be suggesting that the Court should infer that patients pay more for treatment at HHS because HCSC reimburses HHS at a higher rate, but this would be purely speculative and not supported by any allegation in the complaint.  Plaintiff alleges that patients pay more to receive treatment at an out-of-network provider and customers of HCSC may be discouraged from seeking treatment at CORE.  The Court notes that there is an inherently anti-competitive aspect of health insurance, because an insurer will include some providers in a network and exclude others and an insurer's customers will be encouraged to visit in-network providers. Absolute choice of physicians and/or hospitals is not guaranteed to customers of a health insurer. This does not make it an anti-trust violation every time a health insurer decides not to grant in-network status to a healthcare provider.  Plaintiff must be able to plausibly allege with non-speculative facts that the exclusion of CORE actually has an anti-competitive effect, such as higher prices for consumers of healthcare, because healthcare consumers do not possess an absolute right to go to a provider of their choice at reduced in-network rates.  The allegations of the complaint do not support an inference that plaintiff suffered an antitrust injury or that HCSC entered a conspiracy

to keep CORE out of its provider network, and plaintiff's § 1 Sherman Act claim (count one) against HCSC should be dismissed.[8]

## B.

HCSC argues that plaintiff's monopolization claim (count three) fails to state a claim upon which relief can be granted, because it is entirely implausible that a purchaser of health care services would conspire with a health care provider to reduce competition in the health care marketplace and voluntarily pay higher prices to the health care provider.  Dkt. # 69, at 23.  Plaintiff responds that a buyer of health insurance could in theory exercise monopsony power over the market for health services, and HCSC's right to choose with whom it does business is limited when its refusal to contract may result in the monopolization of the health care market in Northeast Oklahoma/Tulsa. Dkt. # 75, at 25-26.

The complaint alleges that "[Hillcrest] and [Ardent], through the help of its co-conspirator [HCSC], are attempting to monopolize or conspiring to monopolize the market for inpatient and outpatient healthcare services in the Northeast Oklahoma/Tulsa area."  Dkt. # 2, at 26.  Plaintiff alleges that HCSC exercises market dominance in the health insurance industry in the Northeast Oklahoma/Tulsa area. Id. at 5.  The complaint does not explain HCSC's motivation for conspiring with HHS and Ardent to monopolize the healthcare market in Northeast Oklahoma and Tulsa, and the monopolization claim is not described in significant detail in the complaint.

Plaintiff alleges a monopolization claim under the Oklahoma Antitrust Reform Act, OKLA. STAT. tit. 79, § 203(B), which provides that "[i]t is unlawful for any person to monopolize, attempt

---

[8]     This finding also results in the dismissal of plaintiff's state law antitrust claim under OKLA. STAT. tit. 79, § 203(A) (count two) as to HCSC.

to monopolize, or conspire to monopolize any part of trade or commerce in a relevant market within this state." Even though the claim is brought under state law, the provisions of the Oklahoma Antitrust Reform Act are interpreted in a manner consistent with federal antitrust laws. OKLA. STAT. tit. 79, § 212. To allege a monopolization claim under the Sherman Act, a party must allege four elements: "(1) relevant market (including geographic market and relevant product market) in which the alleged attempt occurred; (2) dangerous probability of success in monopolizing the relevant market; (3) specific intent to monopolize; and (4) conduct in furtherance of such an attempt." Shoppin' Bag of Pueblo, Inc. v. Dillon Companies, 783 F.2d 159, 161 (10th Cir. 1986). The "dangerous probability of success" element may not be inferred from allegations that a defendant intended to monopolize a market; a plaintiff must be able to allege that there was a "realistic probability that the defendants could achieve monopoly power in the market." Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 459 (1993). Factors relevant to making this determination include "whether the defendant is a multimarket firm, the number and strength of competitors, market trends, and entry barriers." Multistate Legal Studies, Inc. v. Harcourt Brace Jovanovich Legal and Professional Publications, Inc., 63 F.3d 1540, 1554 (10th Cir. 1995).

The Court finds that plaintiff has not adequately alleged a monopolization claim against HCSC, because plaintiff has failed to adequately allege that there is a dangerous probability that the alleged conspiracy would be successful. Plaintiff has alleged that HCSC has up to a 64% share of the health insurance marketplace in Northeast Tulsa/Oklahoma, but the alleged monopoly does not concern the product market of buying or selling health insurance. See Dkt. # 2, at 5. Instead, HCSC is allegedly participating in a scheme with HHS and Ardent to monopolize the product market of delivery of healthcare services to patients. Id. at 26. For the purpose of plaintiff's monopolization

18

claim, the "relevant market" consists of persons or entities who actually provide healthcare.  Plaintiff

argues that HCSC could be held liable under a monopsony theory, because it has alleged that HCSC

used its market power to decrease market demand for plaintiff's services.  Dkt. # 75, at 26.  "In a

monopsony, the buyers have market power to decrease market demand for a product and thereby

lower prices," and this could include monopsonistic practices by buyers in the relevant market place.

Campfield v. State Farm Mut. Auto Ins. Co., 532 F.3d 1111 (10th Cir. 2008).  However, there are

no allegations in the complaint supporting liability under such a theory and HCSC had no notice that

plaintiff was attempting to assert a monopolization claim under a monopsony theory.  In particular,

there are no allegations that HCSC's conduct had the effect of decreasing market demand for

healthcare or that HCSC engaged in a conspiracy to drive down the cost of healthcare for the

purpose of driving plaintiff out of the market.  Instead, plaintiff has alleged that HCSC entered a

conspiracy under which it would pay more to HHS and Ardent for healthcare services than if HCSC

had contracted with CORE or encouraged more referrals to Bristow Healthcare.  Even if the Court

were to assume that plaintiff attempted to allege a monopsonistic conspiracy in the complaint, the

alleged conspiracy would not actually function as a monopsony and the alleged conspiracy would

be implausible.[9]  Plaintiff's monopolization claim against HCSC (count three) should be dismissed.

---

[9]     Plaintiff cites Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585 (1985), and
argues that the refusal to deal with a party can sometimes give rise to liability under a
monopolization theory if the party refusing to contract does so with the intention of creating
or furthering a monopoly.  Dkt. # 75, at 26-27.  The Tenth Circuit has characterized Aspen
Skiing as a limited exception to the general rule of business independence to deal or not deal
with certain parties, and a necessary condition for liability under Aspen Skiing is that the
monopolist and rival have a "preexisting and presumably profitable course of dealing."
Novell, Inc. v. Microsoft Corp., 731 F.3d 1064, 1075 (10th Cir. 2013).  CORE and HCSC
did not have prior business relations and they are not in the position of monopolist and rival,
and Aspen Skiing has no applicability to this case.

## C.

HCSC argues that plaintiff has not stated a claim for tortious interference with business relations, because there are no allegations that HCSC has interfered with any contract between plaintiff and a third party.  Dkt. # 69, at 25.  Plaintiff responds that HCSC's actions have interfered with plaintiff's business relations with patients that would seek treatment at CORE if it were an in-network provider.  Dkt. # 75, at 27-28.

To state a claim for tortious or malicious interference with a business relationship, plaintiff must allege sufficient facts for the Court to infer "1) interference with a business or contractual right; 2) malicious and wrongful interference that is neither justified, privileged, nor excusable; and 3) damages proximately sustained as a result of the interference."  Tuffy's, Inc. v. City of Oklahoma City, 212 P.3d 1158, 1165 (Okla. 2009).  The party alleging a tortious interference claim cannot be a party to the contractual or business relationship that was allegedly interfered with  and such a claim is cognizable only against a third party to the contract or business relationship.  Wilspec Technologies, Inc. v. DunAn Holding Group, Co., 204 P.3d 69, 74 (Okla. 2009). The Tenth Circuit has found that Oklahoma law does not create a contract between doctor and patient but, instead, an at-will relationship that cannot form the basis for a tortious interference claim.  Cohlmia v. St. John Med. Center, 693 F.3d 1269, 1285 (10th Cir. 2012).

Plaintiff claims in its response that defendant interfered with its relations with patients who would seek treatment at CORE if HCSC had made CORE an in-network provider.  Dkt. # 75, at 28. However, the complaint is unclear as to what contract or business relationship HCSC allegedly interfered with and the complaint does not give HCSC sufficient notice to defend against this claim. At best, the complaint alleges that BMC, Cimarron, and CORE have "business and contractual

rights" with unidentified parties and that HCSC's actions have interfered with these business and contractual rights.   Dkt. # 2, at 27.   There is no way to determine what contract or business relationship HCSC has allegedly interfered with and it is not reasonable to expect HCSC to prepare a defense to this claim.   The key fact underlying plaintiff's tortious interference claim is HCSC's refusal to add CORE as an in-network provider, but HCSC would not be a third-party to this contract.   HCSC's decision not to contract with CORE cannot be the basis of a tortious interference claim, because HCSC was not a third-party to the contract.   Assuming that plaintiff had alleged that the relevant business relationship was between plaintiff and its patients, this would still not give rise to liability for tortious interference with business relations under Oklahoma law.   Patients could still seek treatment from plaintiff and BMC or Cimarron and there is no allegation that HCSC interfered with patient referrals to BMC or Cimarron.[10]   Plaintiff may disagree with HCSC's decision not to add CORE to Bristow Healthcare's existing provider agreement, but plaintiff has not cited any authority that, as a matter of Oklahoma law, HCSC was required to contract with CORE or that an insurer's decision not to contract with a provider is inherently improper or unjustified.   Plaintiff's claim for tortious interference with contractual or business relations (count four) should be dismissed for failure to state a claim.

---

[10]    Plaintiff has alleged that patients cannot currently be referred to BMC for surgery due to remodeling of the surgical facilities at BMC, but this was a voluntary decision by plaintiff and plaintiff has not alleged that defendant had a contractual obligation to allow plaintiff to refer patients to CORE to accommodate plaintiff's decision to remodel its facilities.   See Dkt. # 2, at 17.   In other words, it was not improper or unjustified for HCSC to deny plaintiff's request to refer surgical patients to CORE on an in-network basis due to plaintiff's voluntary decision to close the surgical facilities at BMC for remodeling.

**IT IS THEREFORE ORDERED** that Defendant Health Care Service Corporations's Motion to Dismiss Plaintiff's Complaint (Dkt. # 68) and Defendant Blue Cross and Blue Shield Association's Motion to Dismiss Plaintiff's Complaint (Dkt # 72) are **granted**.  Defendants Health Care Service Corporation and Blue Cross and Blue Shield Association are **terminated** as parties.

**IT IS FURTHER ORDERED** that the Joint Motion for Protective Order to Stay Discovery Directed at Defendants Health Care Service Corporation and Blue Cross and Blue Shield Association (Dkt. # 90) is **moot**.

**DATED** this 8th day of June, 2016.

CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE